## WILKENS et al. v. TRAFIKAKTIEBO-LAGET GRANGESBERG OKELO-SUND.

(Circuit Court of Appeals, Fifth Circuit. December 31, 1925.)

No. 4650.

**1. Shipping ⊚⟞50—Charterers held required to pay only port charges enumerated in charter party.**

Where a charter party in one clause bound owner to pay all port charges and pilotage, and in a subsequent clause bound charterers, in consideration of certain payment by owner, ."to pay port charges at loading ports on outward cargo, viz. tonnage dues, · customhouse fees, levee dues, quarantine fees, cost of fumigating, wharfage, watching, and outward pilotage," held, charterers under latter clause were liable only for port charges enumerated.

**2. Shipping ⊚⟞50—Charterers held not liable to owner for item of pilotage from one dock to another.**

Charterers held not liable under charter party to owner for item of pilotage from one dock to another, necessary only for purpose of bunkering.

**3. Shipping ⊚⟞50—"Wharfage," one of port charges which charterers agreed to pay, held to include "shed hire."**

"Wharfage," one of the port charges which charterers agreed to pay, held to include "shed hire," which amounted only to a charge for storing cargo.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Wharfage.]

**4. Shipping ⊚⟞50—Reference to customs in clause as to loading and discharging held not to apply to remainder of charter.**

In charter clause allowing charterers certain number of days for loading, the phrase "customs and usages at the ports of loading and discharging to be observed, unless otherwise expressed," held to refer to customs and usages as to allowance of Sundays, holidays, and bad weather days, etc., and not to refer to other clauses of the contract.

**5. Shipping ⊚⟞50—Charge must be lien on vessel to constitute a "port charge."**

A charge must be a lien on a ship, either maritime or statutory, which vessel must pay before she is entitled to leave port, to constitute a "port charge."

[Ed. Note.—For other definitions, see Words and Phrases, Port Charges.]

**6. Shipping ⊚⟞50—Wharfage, chargeable to charterers, held to include "dockage."**

Wharfage, which charterers were bound to pay under charter party, held to include "dockage," being charge assessed for number of days ship is at wharf.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Dockage.]

**7. Shipping ⊚⟞50—Construction of dockage charge against vessel as valid preferred.**

Construction of dockage charge against vessel, based on tonnage, which sustains it as a valid constitutional charge, is preferred to one under which it would be rejected as void.

**8. Shipping ⊚⟞50—Charge for inspection of cotton before loading held not a "port charge."**

Charge for inspection of cotton before loading by maritime committee or maritime branch of Cotton Exchange, not being a lien on ship, held not a ."port charge," payable by owner under charter party obligating owner to pay port charges.

**9. Shipping ⊚⟞50—Outward pilotage clause held to cover charge of pilotage from Houston to Port Bolivar.**

Under charter party clause, obligating charterers to pay outward pilotage, charterers were required to pay charge for pilotage from Houston, the place of partial loading, as far as Port Bolivar, since, if vessel had proceeded directly from Houston to sea, it would have passed through Port Bolivar.

**10. Shipping ⊚⟞50—"Extra port charge" clause held to cover charge of pilotage from Port Bolivar to Galveston pier.**

Where charter party contemplated partial loading at Houston, and completing loading at Galveston, under clause obligating charterers to pay "all extra port charges incurred at second port," charterers were required to pay pilotage charge from Port Bolivar to the pier at Galveston as an "extra port charge"; it being in addition to charges that would not have been incurred if the vessel had not stopped at Galveston to take on remainder of cargo.

Appeal from the District Court of the United States for the Southern District of Texas; Joseph C. Hutcheson, Jr., Judge.

Libel in personam by the Trafikaktiebolaget Grangesberg Okelosund against R. B. Wilkens and Carl C. Biehl, composing the partnership of Wilkens & Biehl. From a decree for libelant (4 F.[2d] 577), respondents appeal. Decree modified, and, as modified, affirmed.

John Neethe, of Galveston, Tex. (Williams, Neethe & Williams, of Galveston, Tex., on the brief), for appellants.

J. Newton Rayzor, of Houston, Tex., and H. C. Hughes, of Galveston, Tex. (Lockhart, Hughes, Lockhart & Rayzor, of Galveston, Tex., on the brief), for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge. This is a libel in personam by the owner of the Swedish steamship Laponia, to recover the sum total of certain deductions made by the shippers of a cargo of cotton in an accounting under a contract of affreightment. The defense is that the deductions were authorized by the contract, or charter party, as it is designated by the parties.

The provisions of that instrument, material to the controversy, are:

"(1) That the said steamer [Laponia] * * * shall proceed * * * to Houston and/or Galveston (including Texas City and Port Bolivar), * * * and there * * * shall load from the said charterers or their agents, at such wharf or dock as they may direct, and if afterwards required by them to shift from one terminal to another at any port more than once, they to pay the ordinary expenses of towing, a full and complete cargo of lawful merchandise, * * * and, having arrived at the port or ports of discharge as ordered, * * * shall there deliver the same, * * * agreeable to bills of lading on being paid freight, in full of all port charges and pilotages, at and after the rates of thirty-seven shillings and sixpence per net register ton.

"(2) Charterers are to pay for loading cargo, and compressing cotton, at loading port, but no other charges, and the stevedore to be appointed by them, who is to load the steamer under the captain's direction.

"(3) * * * Charterers to have the option of loading at any two of the above ports, they paying all extra port charges incurred at second port, and time used in shifting ports to count as lay days," etc.

"(4) All ordinary disbursements at port of loading to be paid by the charterers, who are to be reimbursed for the amount thereof, with 2½ per cent. commission thereon," etc.

"(5) * * * Twelve (12) working days (Sundays, holidays, and bad weather days excepted) shall be allowed the charterers for loading, and the steamer to be discharged with all dispatch, according to the custom of the port of discharge. The customs and usages at the ports of loading and discharging to be observed, unless otherwise expressed."

"(20) Owners to pay charterers 2s. per net register ton, in consideration of which charterers agree to pay port charges at loading ports on outward cargo, viz. tonnage dues, customhouse fees, levee dues, quarantine fees, and cost of fumigating, wharfage, watching, and outward pilotage."

The steamer was required by the charterers to report at Houston, was there partially loaded, and then proceeded to Galveston, where the cargo was completed. At Houston the steamer was required by the charterers to shift from wharf No. 8 to Anderson's dock for cargo, and that was the only shift made at the instance of the charterers. A second shift, for the purpose of obtaining bunkerage, was made to the Sinclair dock, and from there the steamer proceeded in charge of a pilot by way of Port Bolivar to pier No. 38 at Galveston.

According to custom and usage at the port of Houston, charges are made against vessels for "shed hire" and "dockage," and these charges are separate and distinct from a charge for wharfage. "Shed hire" is a term used to designate a charge for a shed berth in which to assemble cargo. For this purpose a uniform flat rate of $50 is charged, regardless of the size of cargo. "Dockage" is a charge assessed for the number of days a ship is at the wharf, and the rate is one-half cent per gross registered ton per day for each and every day a vessel remains at the dock. Shed hire and dockage are also charged at the port of Galveston, but the rates are higher; that for shed hire being $150, and that for dockage 2½ cents per ton per day. At each port, also, the maritime committee or marine branch of a Cotton Exchange inspects cotton prior to its being loaded upon vessels, for the purpose of ascertaining the sizes of the bales, the nature of the wrapping, "and any other detail in which the bale may not be a proper package," and for this inspection assesses a fee of one cent per bale on square bales, and one-half cent per bale on round bales.

The items of expense in dispute are:

At Houston:

Pilotage from wharf No. 8 to Anderson's dock ........................ $ 20.00
Pilotage from Anderson's dock to Sinclair dock ........................ 20.00
Shed hire, Houston Compress Company 50.00
Dockage, Houston Compress Company 140.75
Marine branch of Houston Cotton Exchange ........................... 83.22

Between Houston and Galveston:

Pilotage from Houston to Port Bolivar 42.50
Pilotage from Port Bolivar to pier No. 38, Galveston .................... 40.00

At Galveston:

Shed hire, Galveston Wharf Company.. 150.00
Dockage, Galveston Wharf Company.. 281.50
Marine branch of Galveston Cotton Exchange ........................... 66.90

The District Judge entered a decree in favor of libelant, owner of the steamship, for $896.65, which includes items no longer contested and all the items in dispute above listed, except the inspection fee of $83.22 paid by the charterers to the marine branch of the Houston Cotton Exchange.

The charterers appeal, and contend that the expenses they deducted were not included in the port charges which they agreed in clause 20 to pay, and were not extra port charges incurred at the second port, for which they were liable under clause 3, but, under the customs and usages at the ports of loading, that they were entitled under clause 4 to be reimbursed by the vessel. On the other hand, the owner insists that the disbursements were either port charges, under clause 20, or extra port charges, under clause 3, and were payable by the charterers in either event.

[1] In the first clause of the contract the owner bound itself to pay all port charges and pilotages, but in clause 20 agreed to pay the charterers two shillings per net ton, in consideration of which the charterers agreed to pay port charges, "viz. tonnage dues, customhouse fees, levee dues, quarantine fees, and cost of fumigating, wharfage, watching, and outward pilotage." Taking the two clauses together, we think the charterers only bound themselves to pay the port charges which were enumerated. It therefore becomes necessary to determine whether the owner, who was bound to pay port charges other than those enumerated, is liable for any or all of the items which were deducted by the charterers.

[2] We do not think the owner is entitled to recover for the two items of pilotage at Houston. The charterers required the vessel to shift but once, and they were only bound to pay expenses of towing in the event they required her to shift more than once. The shift from Anderson's dock to the Sinclair dock was not required by the charterers, but was for the purpose of bunkering, and therefore to serve the requirements of the owner. That item was properly chargeable to the owner.

[3-5] Wharfage, one of the port charges the charterers agreed to pay, clearly includes shed hire, which, according to the testimony, is nothing but a charge for storing cargo. It does not make any difference that it was customary at the port of loading to make a separate charge for shed hire. The customs and usages referred to in clause 5 apply to the allowance of Sundays, holidays, and bad weather days, and the observance generally of the manner of loading and discharging cargo. They do not have reference to other clauses of the contract. Davis v. Wallace, Fed. Cas. No. 3,657; Carbon Slate Co. v. Ennis, 114 F. 260, 52 C. C. A. 146; Holman v. Gans S. S. Line, 186 F. 96, 108 C. C. A. 208. A lien upon a ship, either maritime or statutory, something a vessel has to pay before she is entitled to leave port, is required to constitute a port charge. Scrutton on Charter Parties and Bills of Lading, 234; Newman v. Lamport, 1 Q. B. 20.

[6, 7] We are of opinion that wharfage includes dockage also. The Brooklyn (D. C.) 46 F. 132. But, even if it does not, the charterers were bound by clause 20 to pay tonnage dues. The charge for dockage was in proportion to the tonnage of the ship, and is sustainable as a valid and constitutional charge. Packet Co. v. Keokuk, 95 U. S. 80, 24 L. Ed. 377. A construction which sustains that charge as valid is to be preferred to a construction under which it would have to be rejected as void. American Sugar Refining Co. v. Newman Grocery Co. (C. C. A.) 284 F. 835.

[8] The inspection fee of the maritime branch of the Cotton Exchange is not shown to be authorized by any public authority, and is not explained in the testimony, further than that it is a fee levied upon cotton upon the wharf and before it reaches the ship. For all that appears, it is a voluntary payment by shippers of cotton. It is not such a charge as creates a lien on a ship, is not controlled by local custom, and in our opinion is not a port charge at all.

What we have already said disposes of the charges at Galveston for shed hire, dockage, and inspection fee of the maritime branch of the Galveston Cotton Exchange in favor of libelant.

[9, 10] There remains to be considered the

pilotage from Houston, by way of Port Bolivar, to Galveston. If the steamer had proceeded direct from Houston to sea, it would have passed through Port Bolivar. The charge for pilotage that far was required by clause 20 to be paid by the charterers. The pilotage charge from Port Bolivar to the pier at Galveston was authorized by clause 3 as an extra port charge; for it was in addition to charges that would have been incurred if the steamer had not stopped at Galveston to take on the remainder of her cargo.

Our conclusions are that the decree should be modified, by adding to it $83.22, the inspection fee of the maritime branch of the Houston Cotton Exchange, which was rejected by the District Court, and by subtracting from the total thus arrived at the sum of $40 for pilotage at Houston from wharf No. 8 to Anderson's dock, and from Anderson's dock to the Sinclair dock. The result is that in our opinion the decree should be increased from $896.65 to $939.87, with interest as allowed by the District Judge.

The decree is modified accordingly, and, as so modified, is affirmed.